DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, James G., Jr. ("James"), has appealed from a judgment of the Wayne County Court of Common Pleas, Juvenile Division, that terminated his parental rights and placed his three minor children in the permanent custody of Wayne County Children Services Board ("CSB"). This Court affirms.
 I. {¶ 2} This is James's second appeal from a judgment of the trial court permanently terminating his parental rights to his three minor children, T.G., born June 8, 1999; K.G., born May 28, 2000; and S.G., born June 18, 2001. The mother of the children voluntarily surrendered her parental rights and was not a party to either appeal. In the first appeal, James appealed from the trial court's decision that had relied on the so-called "12 of 22" provision that is set forth in R.C. 2151.414(B)(1)(d), that the children had been in the agency's temporary custody for 12 of the past 22 months, despite the fact that CSB had filed its motion for permanent custody before 12 months had elapsed. Because 12 months had not elapsed before CSB filed the motion, and the trial court had made no alternate finding to satisfy the first prong of the permanent custody test (i.e., that the child is abandoned, orphaned, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent), this Court reversed and remanded the trial court's judgment that terminated James's parental rights. See Inre K.G., S.G., T.G., 9th Dist. Nos. 03CA0066, 03CA0067, and 03CA0068, 2004-Ohio-1421.
 {¶ 3} On remand, the trial court scheduled the matter for a pretrial, which was not recorded. On April 26, 2004, the trial court issued a decision in which it explained that it had reviewed the transcript of the permanent custody hearing and found that CSB had pled and proven an alternate basis for permanent custody. The trial court again granted CSB's motion and terminated James's parental rights, indicating that permanent custody was in the children's best interests and that the children could not be placed with either parent in a reasonable time or should not be placed with them because the parents had failed to substantially remedy the conditions that caused the children to be placed outside the home. See R.C. 2151.414(E)(1). James timely appealed, raising four assignments of error.
 II. Assignment of Error Number One
"The Wayne County Court of Common Pleas, Juvenile Division, erred in not conducting a new hearing for permanent custody."
 {¶ 4} Through his first assignment of error, James has contended that the trial court denied him due process by failing to hold a new hearing on permanent custody after this Court reversed and remanded the case. James has specifically contended that, at the first hearing, he had been put on notice only regarding the "12 of 22" ground and "was not put on notice for that hearing to defend the first prong of clear and convincing evidence that the children could not and should [not] be placed with him in a reasonable time."
 {¶ 5} James's argument is directly contradicted by the trial court record. In the original motion for permanent custody, in addition to alleging the "12 of 22" ground that this Court reversed, CSB alternatively alleged that the children could not be placed with either parent within a reasonable time or should not be placed with either parent because, among other reasons, the parents had failed to substantially remedy the conditions that caused the children to be placed outside the home. See R.C.2151.414(E)(1).
 {¶ 6} James had notice and an opportunity to be heard on this issue at the original permanent custody hearing. The record further reveals that James not only had the opportunity to be heard on this issue, but he was in fact heard on this issue. CSB presented evidence in support of these allegations and James cross-examined CSB witnesses and also offered his own evidence to attempt to refute CSB's allegations.
 {¶ 7} James was given notice that CSB was proceeding on the alternative ground set forth in R.C. 2151.414(E)(1) and he was given a full opportunity to be heard on this issue at the original permanent custody hearing. He has failed to make any demonstration to this Court that the trial court impinged upon his due process rights by failing to hold another permanent custody hearing on remand The first assignment of error is overruled.
 Assignment of Error Number Two
"The guardian ad litem failed to express the wishes of the children."
 Assignment of Error Number Three
"The Wayne County Children Services Board case plan failed to provide services to address the reason for the children's removal and was not relieved from doing so."
 {¶ 8} This Court will address these assigned errors together because the same reasoning disposes of each. James has raised two arguments that, unlike the issue raised through his first assignment of error, do not challenge any action taken by the trial court on remand Instead, these issues pertain to the permanent custody hearing that was held prior to the first appeal. The merits of these assigned errors will not be addressed because "issues beyond the scope of a previous remand are beyond the scope of review following a return of the case from remand"State ex rel. National Elec. Contrs. Ass'n v. Ohio Bureau Emp.Servs. (2000), 88 Ohio St.3d 577, 579, citing State v. Gillard
(1997), 78 Ohio St.3d 548, 549.
 {¶ 9} In this appeal, James cannot litigate issues that were, or could have been raised in the first appeal. See State v.D'Ambrosio (1995), 73 Ohio St.3d 141, 143. Because James could have raised these challenges in his first appeal, but did not, he is barred by the doctrine of res judicata from raising them in his second appeal. The second and third assignments of error are overruled accordingly.
 Assignment of Error Number Four
"The trial court erred in finding clear and convincing evidence that an award of permanent custody to Wayne County Children Services Board was in the best interest of all of the children."
 {¶ 10} James did raise the best interest issue in his prior appeal and this court did not address its merits because the case was reversed and remanded on other grounds. Consequently, this assigned error is properly before this Court.
 {¶ 11} Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least twelve months of the prior twenty-two months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, In re William S. (1996),75 Ohio St.3d 95, 99. James challenges only the trial court's finding on the best interest prong of the permanent custody test.
 {¶ 12} When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C.2151.414(D)(1)-(4).[1]
 {¶ 13} When CSB initially became involved with this family, one of its primary concerns was that the parents had minimal interaction with the two youngest children, K.G. and S.G. The parents' poor interaction with the children, including a lack of stimulation and effort to bond with them, remained a primary concern of CSB throughout the case plan period.
 {¶ 14} James's interaction with the children did not progress beyond supervised visitation. During the 18 months that James worked on his case plan, he missed approximately 30 to 35 percent of the scheduled visits with his children. Although he testified that he had to work or had other commitments, the caseworker testified that James had offered a legitimate explanation for only one of the many visits that he missed. Moreover, because James was unemployed for most of the case plan period, he was not likely missing visits due to his work schedule.
 {¶ 15} When James did attend visits, he interacted almost exclusively with T.G., the boy, and virtually ignored K.G. and S.G., the girls. The caseworker and three different case aids testified that they observed this behavior again and again. If directed to interact with K.G. and S.G., James would do so, but otherwise he let them play on their own. At some visits, James would not interact with any of the children but would sit on the couch by himself. James also left several of the visits early.
 {¶ 16} Because James did not interact with the girls, the older girl, K.G., would come crying to him but he would still ignore her unless the case aid instructed him to comfort her. One case aid testified that the younger girl, S.G., did not seem to be bonded with James at all and that "I don't know that she really understands that James is even her father[.]" This witness further explained that, on one occasion, she had tried to take a picture of S.G. with James and it was very difficult to get the child to sit in his lap.
 {¶ 17} Several different witnesses testified that, despite the fact that James had completed parenting classes, they had seen little improvement in his interaction and relationship with his children over time. Another witness explained that James was often overwhelmed trying to manage all three children at once or even feeding them during a visit. This witness questioned how James could care for all three children on a regular basis. The consensus of CSB's many witnesses was that James did not have the ability to care for his three children.
 {¶ 18} A clinical psychologist who had seen T.G., the oldest child, explained the importance of bonding to the development of a child. The witness further explained that, due to an apparent lack of bonding with his parents, T.G. had difficulty accepting comfort or help from a caregiver. Other witnesses testified that K.G. had similar problems accepting comfort and bonding with a caregiver.
 {¶ 19} T.G. and K.G. also had developmental delays in both speech and motor skills. The experts testified that the delays were due, in part, to the lack of stimulation that they had received from their parents. At the age of 20 months, K.G. was speaking at the level of a 15-month-old. T.G.'s speech was even more delayed. At the age of two and one-half years old, "his speech was not understandable at all." He also had significant delays in his gross motors skills: he could not run, climb stairs, or kick a ball. Due to the extent of T.G.'s delays, neurological testing was done, but no neurological problems were detected.
 {¶ 20} In addition to concerns about the parents' failure to stimulate and interact with the children, CSB had also been concerned that the parents would not follow through with getting T.G. and K.G. the special services that they needed. After they were placed with the foster family, T.G. and K.G. began to receive the special services that they needed and, due to those services, each child's developmental delays were lessening. Several witnesses testified that both T.G. and K.G. would need to continue in special education classes to address their developmental delays and, if they did not, the delays could become more severe.
 {¶ 21} T.G.'s psychologist further testified that, to overcome his developmental delays, he needs a caregiver who will give him a lot of attention. The foster family had given the children a loving and structured environment and that environment had also had a positive impact on all three children. The children were doing well there and were beginning to bond with the foster parents. S.G., in particular, was very bonded to the foster mother. The children were also bonded to each other and all three were living together in the same foster home. Different witnesses testified that each child had improved while living with the foster family.
 {¶ 22} Because the children were only two, three, and four years old at the time of the hearing, the guardian ad litem testified and issued a report on their behalf. The guardian ad litem stressed that the children were making great progress while in foster care but the parents had barely begun to address their own problems and could not meet even their own needs, let alone those of their children. The guardian ad litem concluded that a stable environment is in the children's best interest and the parents are unable to give them that environment.
 {¶ 23} The custodial history of these children began in their parents' home where, as indicated above, there was a lack of interaction and stimulation and the children were not developing normally. At the time of the hearing, the children had spent a year and a half in foster care, in a loving environment, and were regularly attending the therapy sessions that they needed. During that time, as the guardian stressed, the children made progress while James did not change his position much at all. At that time, James had not completed anger management classes, he did not consistently attend visitation or his counseling sessions, and he was unemployed with no source of income and had been for many months. One case aid testified that, when she asked James to bring snacks or cups for his children to the visitation sessions, James explained that he could not because he didn't have any money. If James could not find the means to provide even a snack or some cups for his children, it is not likely that he could support them on a regular basis. Moreover, James was living with relatives and was likely finding a way to feed himself but was not able to make even a minimal contribution to the needs of his children.
 {¶ 24} James had been given well over a year but, according to several witnesses, his parenting skills had not improved and he was not able to support even himself, let alone three small children. Although he testified that he planned to start truck driving school soon, he had not yet begun classes. Some witnesses questioned whether James would be able to follow through with the schooling because he had not followed through with counseling, visitation, or most of the requirements of his case plan.
 {¶ 25} There was also testimony that all three children need a stable environment and that James cannot provide it because he has no housing or income and he has demonstrated a long history of not coming through for these children. Several service providers testified that, due to the developmental delays and behavior issues that T.G. and K.G. have, it is essential that they have a loving caregiver who will provide them with a stable and structured environment and who will be consistent in interacting with them, working on their developmental skills, and regularly involving them with the special service providers that they need.
 {¶ 26} Given the evidence presented during the original permanent custody hearing, the trial court could reasonably conclude that permanent custody was in the best interests of T.G., K.G., and S.G. The fourth assignment of error is overruled.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Slaby, J., Boyle, J., Concur.
[1] The factor set forth in R.C. 2151.414(D)(5) is not relevant in this case.